# EXHIBIT A

## ACTIVITY AND FACILITY USE AGREEMENT

This Agreement, including the Attachments hereto (the "**Agreement**"), by and between Paradise Entertainment Group, Inc. d/b/a Magic City ("**Company**") and _Raven Bankston_ ("**Participant**") is entered into effects as of this _13_ day of _May_, 20_13_ (the "**Effective Date**").

WHEREAS, Company is the owner of a club located at 241 Forsyth Street, S.W., Atlanta, Georgia 30303 ("**Premises**"); and

WHEREAS, Company provides facilities at Premises for the activity of surface performance and pole dancing (the "**Activities**") to certain individuals; and

WHEREAS, all individuals who desire to engage in the Activities at the Premises must execute an agreement substantially similar to this Agreement as a prerequisite to engaging in the Activities at the Premises; and

WHEREAS, Participant desires to engage in the Activities at the Premises and Company desires to permit Participant to engage in the Activities at the Premises.

THEREFORE, for mutual consideration, the adequacy of which is acknowledged by both parties to this Agreement, Participant and Company agree to the following terms and conditions:

1.    **Consideration.** Company hereby agrees to permit Participant to engage in the Activities at the Premises at such times as are mutually agreed by Participant and Company. In exchange, Participant agrees to pay Company a fee each time Participant enters the Premises for purposes of engaging in the Activities (the "Fee"). The current schedule of Fees is set forth at <u>Attachment A</u> to this Agreement. Company reserves the right to unilaterally modify any portion of Attachment A at any time in its sole discretion. The Fee must be paid in full by Participant as a condition precedent for Participant to have the right to engage in the Activities at the Premises. Once Participant is admitted to Premises, subject to Participant's compliance with all the terms of this Agreement, Participant may stay on Premises and engage in the Activities until the End Time, as defined on Attachment A, or until such other time as Participant and Company agree.

2.    **Scope and Nature of the Activities.**

2.1    Company shall have the right to direct Participant as to the location or locations within the Premises at which the Activities may be performed.

2.2    Company will provide the space and other integral immobile facilities, such as stages, for the Activities.

2.3    Participant will be solely responsible for providing all other tools, equipment, props, costumes and/or other materials necessary for Participant to perform the Activities at the Premises.

2.4    It is agreed by both parties that Participant has full control on how the Activities will be performed subject to legal and safety considerations.

2.5.    Participant warrants that he or she is not violating any another agreement or restriction by performing the Activities at the Premises.

_R.B._ Participant _KA_ Company

2.6.    Participant warrants that Participant will ensure that he or she does not violate any municipal, state or federal law, regulations or other rules while on the Premises, including, without limitation, while performing the Activities.

3.    **Retention by Participant of Tips Offered by Customers**. Company and Participant acknowledge that the Premises is frequented by individuals who will likely enjoy and appreciate observing Participant performing the Activities and who will likely offer Participant monetary "tips" as a way of showing their gratitude for the enjoyment Participant provides as well as their appreciation for Participant's skills ("Tips"). Company agrees that any such Tips Participant is offered may be accepted by Participant in Participant's sole discretion and, if accepted by Participant shall thereafter become the property of Participant. Company and Participant agree that Company shall not have any right to any portion of Participant's Tips.

4.    **Term**. This Agreement shall commence on the Effective Date and shall continue in effect until Company or Participant terminates this Agreement. This Agreement may be terminated by either party at any time for any reason or for no reason by written notice to the non-terminating party.

5.    **Relationship of the Parties**. The parties hereto acknowledge and agree that under this Agreement Participant is a tenant of Company. The parties expressly agree that Participant is not an employee or contractor of Company and is not entitled to any compensation or benefits of any form from Company.

6.    **Obligations, Acknowledgements and Warranties of Participant.**

6.1    Participant acknowledges and agrees that he or she has the obligation to comply with all applicable tax laws in connection with the receipt of Fees under this Agreement, including, without limitation, the declaration of income and the payment of any taxes due thereon.

6.2    Participant acknowledges and agrees that the Activities involve an inherent risk of bodily injury, including but not limited to, broken bones, strains, sprains, bruises, concussion, heat-related illnesses (hyperthermia), abnormal heartbeat, abnormal blood pressure, and in rare cases, heart attack, stroke and possibly death. Participant acknowledges that neither Company nor its employees, officers, or agents (the "Company Parties") warrant or guarantee the competency, physical condition, or, as applicable, the mental condition of any other individual who engages in the Activities at the Premises, any individual who is admitted to the Premises as a customer or any of the equipment or other facilities used in performing the Activities at the Premises.

6.3    Participant warrants that he or she has verified with his or her physician or other certified medical professional that he or she is physically able to engage safely in the Activities on the Premises. Participant warrants that he or she shall continue to consult on a regular basis with his or her physician or other medical professional to ensure he or she continues to be physically able to engage safely in the Activities on the Premises.

6.4    Participant acknowledges and agrees that he or she shall be solely responsible for paying any costs and expenses Participant incurs in connection with any injury or illness he or she incurs or suffers as a result of engaging in the Activities on the Premises and that Company shall have no liability whatsoever in connection with any such injuries or illnesses unless Participant can show that Company engaged in willful misconduct or gross negligence in connection with the cause of such injury or illness.

-2-

R.B. _____ Participant KJ\ Company

6.5     Participant acknowledges and agrees that he or she is solely responsible for any and all costs arising out of property damage any other consequential costs sustained by Participant in connection with performing the Activities at the Premises.

6.6     Participant acknowledges and agrees that he or she is expected to maintain the physical characteristics set forth on Section B of Attachment B to this Agreement in order to continue to be permitted to engage in the Activities at the Premises.

6.7     Participant acknowledges and agrees that he or she shall promptly notify Company in writing if any of the information set forth on Section A to Attachment B changes.

6.8     Participant avers that he or she is at least 18 years of age and that he or she has provided Company with a valid government permit permitting Participant to engage in the Activities, a copy of which permit is attached to this Agreement at Attachment C hereto.

6.9     Participant agrees to report immediately to Company management any problem, defect or malfunction he or she perceives in connection with any portion of the Premises or with any piece of equipment or fixture located on the Premises ("Premises Fixture") and to refrain from further use of such Premises Fixture until the problem, defect or malfunction is cured or repaired.

6.10     Participant acknowledges and agrees that Participant may be photographed or filmed during the time he or she is engaging in the Activities or is otherwise present at the Premises for purposes of engaging in the Activities.  Participant hereby waives any right he or she may have to such images or any portion of any compensation, royalty or other monies whatsoever that such images may generate.

6.11     Participant acknowledges and agrees that although alcoholic beverages are served on the Premises, Participant is not in any way required or encouraged to consume alcohol on the Premises for purposes of engaging in the Activities.  In the event Participant elects to consume alcohol, Participant agrees to limit such consumption such that his or her blood alcohol level is lower than 0.07.  Participant hereby further acknowledges and agrees that he or she will not under any circumstances, drive or attempt to drive a motor vehicle after leaving the Premises if his or her blood alcohol level is 0.07 or greater.  Company has blood alcohol level monitor on the Premises that Participant may use for purposes of complying with this Section 6.11.  Participant and Company acknowledge and agree that Participant is solely responsible for ensuring he or she complies with this Section 6.11 and the consequences of any noncompliance will be the sole and exclusive liability of Participant.

6.12     Participant agrees that Participant shall not, under any circumstances, bring any illegal drug or other intoxicating substance, prescription medication or any controlled substance (individually and collectively, "Prohibited Substances") onto the Premises.  The sole exception to this prohibition is that Participant may bring onto the Premises medication that was legally prescribed by a medical professional to Participant and that does not in any way interfere with Participant's ability to engage in the Activities.  In the event Participant observes or believes he or she has observed anyone on the Premises using or selling any Prohibited Substance, he or she shall report such observation to Company management immediately.

7.     **Release, Waiver and Covenant Not to Sue.**  Participant (for himself or herself and his or her heirs, executors, agents, administrators, and assigns) agrees to waive, release, hold harmless, covenant not to sue, and forever discharge the  Company Parties from any and all claims, demands, rights, causes of action, judgments, costs and expenses, or other liability of whatsoever kind or nature resulting from, growing out of, or in any way connected with Participant's engagement in the Activities at the

-3-

R.B. Participant    KJ Company

Premises, including but not limited to, any and all, known or unknown, unforeseen, injuries, including death, damage to property, and their consequences.

**8.   Media; Public Disclosure.** Participant hereby agrees that he or she will not discuss, reveal or comment on any aspect of the Company, its owners, officers, directors, independent contractors, tenants, financial advisors, affiliates, employees, customers, agents, attorneys to any public media (including, without limitation, any public or semi-public electronic posting, television, radio, newspaper (paper or electronic) or magazine (paper or electronic), or any representative of any such media, without the express written permission of Company.

**9.   Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

**10.   Reformation.** Should any provision of this Agreement be declared or be determined by any mediator, arbitrator or court of competent jurisdiction to be wholly or partially illegal, invalid, or unenforceable, the legality, validity and enforceability of the remaining parts, terms or provisions shall not be affected thereby, and mediator, arbitrator or court shall reform any such illegal, unenforceable, or invalid part, term or provision so that such part, term or provisions is legal, enforceable and valid.

**11.   Dispute Resolution.** In the event of any dispute whatsoever between the parties that arises in connection with this Agreement or any aspect of the performance of the Activities by Participant at the Premises (a "**Dispute**"), if such Dispute cannot otherwise be resolved under the terms of this Agreement, the parties agree to engage in the dispute resolution process described in this Section 11:

11.1   <u>Autonomous Dispute Resolution.</u> In the event of a Dispute, the parties hereby agree to make a good faith effort to resolve the Dispute among themselves. The parties agree that such good faith effort must include an initial meeting in person among all the parties wherein the Parties must acknowledge the nature of the Dispute and define the issues related to the Dispute (the "**Initial Meeting**"). This acknowledgement of the Dispute and definition of issues shall be put in writing, dated and signed by both parties (the "**Dispute Notice**"). If there is any disagreement about the content of the Dispute Notice, the disputing party shall draft, sign and date a separate document including their own acknowledgement of the Dispute and definition of the issues, which will become part of the Dispute Notice. The parties agree that the Dispute Notice must be drafted and finalized during the Initial Meeting of the parties in this Dispute resolution process and each party must receive a copy of the Dispute Notice during the Initial Meeting. Thereafter, the parties must meet again in person within seven (7) business days of the Initial Meeting (the "**Second Meeting**"). During the Second Meeting the parties will discuss alternatives they each believe will resolve the Dispute and make a good faith effort to agree to a resolution. If the parties both agree, they may engage in additional discussions thereafter in an effort to resolve the Dispute, including discussions with their respective legal counsel. The parties agree that, otherwise, any time after the Second Meeting, if any party believes the Dispute remains partially or wholly unresolved, he or she may give written demand to the other party to engage in the non-binding mediation process described in sub-section 11.2 below (the "**Tier One Notice**"). The Tier One Notice must be provided to the other party within thirty (30) calendar days after the last meeting of the parties under this sub-section 11.1; otherwise the parties must begin the dispute resolution process under this Agreement again. Any costs incurred by any party in connection with this part of the dispute resolution process will be paid by the party incurring such costs.

11.2   <u>Informal Mediation.</u> In the event a Dispute is not resolved under the procedure described in 11.1 above, at the same time either party provides a Tier One Notice to the other party, the parties hereby agree that such party shall also send a copy of the notice to:

-4-

R.B. Participant ___ Company

Suzanne M. Arpin, Esq.
Thompson Hine LLP
Two Alliance Center
3560 Lenox Rd,. Ste. 1600
Atlanta, GA 30326
Suzanne.arpin@thompsonhine.com,

or such other individual as the parties mutually agree (hereinafter "**Arpin**"). Within ten (10) business days, Arpin shall engage, on the parties' behalf, an attorney (or other professional) of appropriate expertise, as determined in good faith by Arpin in her sole discretion, to assist with the resolution of the Dispute (the "**Arbiter**"). Arpin will notify the parties of her choice of Arbiter and provide the parties with the Arbiter's contact information, with a copy to the Arbiter. Within ten (10) business days of receiving notice of the Arbiter's selection (the "**Submission Period**"), each party may submit to the Arbiter a written summary of the Dispute including why the Dispute should be resolved in his or her favor and any other relevant information including copies of any pertinent documents related to the Dispute. Within twenty (20) business days after the Submission Period has expired, the parties hereby agree that the Arbiter and the parties shall meet at a mutually agreed time and place (and shall continue so meeting if necessary on future occasions) and shall make a good faith effort to resolve the Dispute (the first such meeting, the "**Initial Arbiter Meeting**"). The Parties agree that they shall be equally responsible for equal portions of the Arbiter's fee and will otherwise be responsible for their own individual costs. The parties agree that if any party believes the Dispute remains partially or wholly unresolved thirty (30) calendar days after the Initial Arbiter Meeting, he or she may give written demand to the other party to engage in the formal and binding mediation process described in sub-section 11.3 (the "**Mediation Request**"). Such Mediation Request must be provided within sixty (60) calendar days after the last meeting among the Arbiter and the parties; otherwise the parties must begin the dispute resolution process under this Agreement again.

11.3    Binding Mediation. In the event a Dispute is not fully resolved under the procedure described in 11.1 or 11.2 above, a party may issue to the other party a Mediation Request. The parties hereby agree that any claim or dispute arising out of or related to this Agreement shall, if not otherwise resolved by the parties under this Section 11, be subject to mediation as a condition precedent to institution of legal proceedings or some other dispute resolution procedure by either party. The parties agree that they shall each endeavor to resolve their claims and disputes by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Commercial Mediation Procedures of the American Arbitration Association currently in effect. In addition to providing the Mediation Request to the other party, the Mediation Request shall be filed with the American Arbitration Association (or such other organization as the parties agree). The parties agree that they shall be equally responsible for equal portions of the direct costs of mediation and will otherwise be responsible for any costs they individually incur in connection with the mediation. The mediation shall be held in Atlanta, Georgia, unless another location is mutually agreed upon by the parties. Agreements reached in mediation shall be considered confidential and binding in support of a settlement between the parties.

11.4    Notices. Notices required under this Section 11 shall be sent to Company at the address set forth in the first paragraph of this  by U.S. certified mail and to Participant at the postal address set forth at Section A of Attachment B or such other address as Participant provides in writing to Company.

12.    **Legal Capacity; Knowing Agreement.** Participant is suffering under no legal disabilities, and Participant has read this Agreement carefully, understands it, and agrees to be bound by its terms. Participant acknowledges his or her understanding of the risks set forth herein and knowingly agrees to accept full responsibility for his/her own exposure to such risks. Participant also acknowledges

-5-

R.B. Participant KA Company

that he or she has had an opportunity to ask a representative of Company any and all questions that Participant has concerning this Agreement, the Premises and the Activities and that his or her questions have been answered satisfactorily.

IN WITNESS WHEREOF, the parties hereto have executed or caused their duly authorized representatives to execute this Agreement as of the day and year first above written.

COMPANY

Signature: _Katri S____

Print Name: _Katrina Smith_

Title: _Office Manager_

PARTICIPANT

Signature: _Raven Bankston_

Print Name: _Raven Bankston_

WITNESS:   Signature:_____

Print Name: _____

-6-

R.B. Participant   KS Company

# ATTACHMENT A

<u>Fee Schedule (Effective July 30, 2012)</u>

The following are the Fees Participant is required to pay Company each time Participant enters the Premises for purposes of performing the Activities. The amount of the Fee is based on Participant's arrival time at the Premises. The only periods during which Participant may enter Premises for purposes of engaging in the Activities are the times set forth below.

*<u>Company may modify this Attachment A at any time in its sole discretion.</u>*

## Activity Fee
### *First Session - 3:00PM-10:00PM*

<u>Monday THRU Saturday</u>
2:00-3:00 FREE <u>(DRESSED & UPSTAIRS/SIGNED IN before 3:00PM)</u>
3:01-3:30   $10.00
3:31-4:00   $25.00
4:01-5:00  $40.00
NO ADMISSION AFTER 5:00PM

First Session dancers may stay, and are generally expected to stay, until 10:00PM unless Management and the dancer agree to other hours

## House Rules for First Session:
- ❖ Once you sign in you may not leave without notifying Management until First Session ends at 10:00pm.
- ❖ You will not be admitted to dance after 5:00pm. (THERE ARE ABSOLUTELY NO EXCEPTIONS REGARDLESS OF THE REASON YOU ARRIVE AFTER 5).
- ❖ If you elect to stay for the purpose of dancing during any portion of the Second Session immediately after you have attended a First Session, you must sign in again and pay the appropriate fee.

-7-

*R.B.* Participant ___ Company

## Activity Fee
### Second Session - 8:00PM-3:00PM

## NOTE: *From the time you sign in you have 1 hour to get ready, be upstairs and on the floor. If you are late there is a $25 fine*

**Monday AND Saturday**
8:00-8:30    $75.00
8:31-9:00    $100.00
9:31-11:00  $150.00
**NO ADMISSION AFTER 11:00PM**


**Tuesday, Wednesday AND Thursday**
8:00-8:30    $25.00
8:31-9:30    $50.00
9:31-11:00  $85.00
**NO ADMISSION AFTER 11:00PM**


**Friday**
8:00-8:30    $50.00
8:31-9:30    $75.00
9:31-11:00  $125.00
**NO ADMISSION AFTER 11:00PM**


**House Rules for Second Session:**
- ❖ The earliest you are allowed to dance is 8:00pm
- ❖ If you danced during a First Session immediately prior to a Second Session, you may not leave without notifying Management until 2:30am; otherwise, you may not leave without notifying Management until 2:45am.
- ❖ You will not be admitted to dance after 11:00pm. (THERE ARE ABSOLUTELY NO EXCEPTIONS REGARDLESS OF THE REASON YOU ARRIVE AFTER 11).

-8-

R.B. Participant ___ Company

# ATTACHMENT B

<u>Section A: Participant Information</u>

Full Name: Raven Bankston

**\*\*Participant acknowledges and agrees that he or she is expected to maintain the physical characteristics in order to continue to be permitted to engage in the Activities at the Premises\*\***

-9-

R.B. Participant ⟋⟍ Company

# ATTACHMENT C

[Attach copy of Participant's proof of age as required under Section 6.8 of the Agreement]

-10-    _R.B_ Participant _W_ Company

# ATTACHMENT D

## Guidelines to Help Determine Your Body Type

**1. HOURGLASSES** will find that there is at *least* a 6-inch difference between their chest and waist and between their hips and waist. The girths of their chest and hips are within a couple of inches of one another. Common Hourglass measurements for chest, waist and hips respectively are 33-26-33, 36-30-38, 34-28-35, 39-32-38, or 42-35-44.

**2. SPOONS** will find that there is not a significant difference between the girths of their chest and waist but a significant difference between the girths of their hips and chest. For example, 34-30-38, 36-30-44, or 32-28-39.

**3. RULERS** will find that their chest, waist and hips are relatively close in measurement. Rulers are similar to Hourglasses but are less curvy and not as slender through the waist. For example, 34-30-35, 36-33-37, or 40-36-42.

**4.** Lastly, **CONES** will find that their chest and waist are relatively close in measurement and that their hips and thighs are significantly *smaller* than their chest. For example, 36-32-30, 40-36-33, or 34-30-29.

Remember, if you're overweight, you could be "caught" between body types. If you are, please follow the Hourglass workout until you trim down and your true body type is revealed.

-11-

R.B. Participant  ⟍ Company