**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **KEIRA VAUGHAN, JACQUELINE WOODARD, SASHE OMOGIATE, MAKEDA ROOTS,** | : : : : | |
| **Plaintiffs,** | : : | |
| **v.** | : : | **CIVIL ACTION NO.** |
| **M-ENTERTAINMENT PROPERTIES, LLC; PARADISE ENTERTAINMENT GROUP, INC., d/b/a Magic City; M-ENTERTAINMENT & CONSULTANT SERVICE, INC.; MARVIN L. BROWN; MICHAEL BARNEY, Sr.;** | : : : : : : : : : | **1:14-CV-914-SCJ** |
| **Defendants.** | : | |

## <u>ORDER</u>

This matter appears before the Court on Motions for Summary Judgment filed by both Plaintiffs (Doc. No. [131]) and Defendants (Doc. No. [136]), and a variety of other related motions. After careful consideration of the parties' arguments and the undisputed evidence in this case, Plaintiffs' Motion for Summary Judgment is **GRANTED**, and Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part for the reasons given below.

## I.    BACKGROUND

### A.    <u>The Parties</u>

Defendant Paradise Entertainment Group, Inc. ("PEG") is a legal entity which does business under the name Magic City,[1] a well-known "adult establishment" located in Atlanta, Georgia. <u>See</u> Doc. No. [147-1], p. 3, ¶¶1–2. Magic City has approximately 100–150 exotic dancers on its "roster" at any given time. <u>Id.</u> p. 4, ¶4. The named Plaintiffs in this case are dancers who perform, or have performed, at Magic City. <u>See</u> <u>id.</u> ¶5. Defendant Michael Barney, Sr. is the founder of Magic City, although ownership of the club was eventually transferred to PEG. <u>Id.</u> pp. 7–8, ¶¶14–18. Defendant Marvin L. Brown is now the sole owner of PEG and is responsible for the day-to-day operations of Magic City. <u>Id.</u> pp. 9–10, ¶¶21–26.

Although he is no longer the direct owner, Defendant Barney continues to assist Defendant Brown in the operation of Magic City in his capacity as "a representative of [Defendant M-Entertainment & Consultant Service, Inc. ("MEC")]." <u>See</u> Doc. No. [151-1], pp. 14–17, ¶¶49–63. MEC is a company, owned by Defendant Barney, that owns the "Magic City" name and trademark, and provides "consulting

---

[1] Throughout this order, "Magic City" is used to refer to PEG or persons acting as agents on its behalf as employees, managers, and/or consultants. Where confusion may arise, the Court refers to individual defendants by name.

2

services, marketing, operational strategies," and other services to Magic City. Id. pp. 12, 18, ¶¶38–42, 65. Defendant Barney admitted that, through MEC, he has "provide[d] ideas to Magic City," made "decisions about whether entertainers could perform at Magic City," and made "decisions on whether or not entertainers should be suspended." See Doc. No. [132-16], pp. 12–13; see also Doc. No. [151-1], pp. 15–18, ¶¶52–53, 57, 62–63. Defendant Barney is also the founder and owner of Defendant M-Entertainment Properties, LLC ("MEP"), a company that owns the physical building and real property where Magic City does business. See Doc. No. [147-1], pp. 10–11, ¶¶27–32. MEP does no business other than renting the property to Magic City. Id. p. 12, ¶36.

## B.   **The Written Agreements and Supplementary Documents**

The crux of this lawsuit is the fact that Magic City does not pay the exotic dancers who perform at the club; the dancers' sole source of income are the tips given to them by Magic City's customers. Id. p. 6, ¶¶10–11. In 2004, attorney David Roberts was asked to prepare an "Independent Contractor Agreement." See Doc. No. [132-30], pp. 9–10, 14. Based on his research, Roberts believed "it would be legally permissible" to treat the entertainers as independent contractors. Id. p. 14. The Independent Contractor Agreement was signed by some Plaintiffs, and explicitly stated that the dancer "agree[d] to waive any legal claims against [Magic City] . . . specifically

3

including any claim for any wages and/or overtime pay or any claim under the Fair Labor Standards Act ["FLSA"]." See Doc. No. [132-31], pp. 95–96.

During his deposition, Roberts testified that he could not recall if he made any independent assessment of whether the way Defendants were treating the dancers was consistent with the FLSA. See Doc. No. [132-30], pp. 24–25. Nor could he recall if he interviewed any of Magic City's managers about their interactions with the dancers, but he did recall that he never actually observed the managers' interactions with the dancers. Id. pp. 26–27. Roberts also could not recall whether he ever reviewed certain documents containing "rules," which are discussed below, prepared by Magic City and given to the dancers. See id. pp. 41–42. In doing research on the issue of whether Magic City could classify the dancers as independent contractors, Roberts reviewed Harrell v. Diamond A Entm't, Inc., 992 F. Supp. 1343, 1350 (M.D. Fla. 1997), a case discussed in more detail below. See Doc. No. [132-30] p. 17; see also id. pp. 83–98. Roberts testified that he could not recall if the Harrell case was included in the case law he provided to Magic City, but he "assumed that it was." Id. pp. 36–37.

At some point in 2011 or 2012, Magic City drafted its own independent contractor agreement, and in 2012 attorney Suzanne Aprin reviewed Magic City's contractual arrangement with performers. See id. p. 39; see also Doc. No. [132-22],

4

pp. 75–76; Doc. No. [132-31], p. 18. During Aprin testified that she was "quite aware" of <u>Clincy v. Galardi S. Enterprises, Inc.</u>, 808 F. Supp. 2d 1326 (N.D. Ga. 2011), in which a court from this district found that the exotic dancers at another Atlanta club were employees, not independent contractors. <u>See</u> Doc. No. [132-31], p. 21; <u>see also</u> <u>Clincy</u>, 808 F. Supp. 2d at 1350. Aprin made Defendants aware of various cases finding dancers to be employees under the FLSA. Doc. No. [132-31], p. 34. She stated that "given the state of the law in Georgia, [she] did not think [Magic City] should continue to classify [the dancers] as independent contractors." <u>Id.</u> p. 21.

However, Aprin advised Magic City that she believed it "could form a tenancy relationship with [the] entertainers" without being subject to the FLSA's minimum-wage requirements. <u>See</u> <u>id.</u>, pp. 19–20. She thus drafted the "Activity and Facility Use Agreement," signed by some of the dancers, which provided that they were "tenant[s]" and that they expressly agreed they were not employees of Magic City. <u>Id.</u> 84–85. The agreement contained a provision whereby the dancers agreed to a "covenant not to sue" Magic City. <u>Id.</u> pp. 86–87. The agreement also provided for specific dispute resolution mechanisms, including an agreement to mediation "as a condition precedent to institution of legal proceedings." <u>Id.</u> 87–88.

Aprin testified that she did not advise Magic City about requiring dancers to work a certain number of days per week or whether Magic City should determine the

order in which dancers performed, and testified that she could not recall if she advised Magic City about whether it could require entertainers to wear certain clothing. Id. pp. 24–25. She discussed the issue of whether Magic City could fine its dancers, and did not "see any problem" because she believed Magic City would only fine dancers for "some egregious behavior, like if a dancer fought with a customer or another dancer." Id. p. 25. Aprin did not observe how Magic City conducted its business. Id. pp. 26–27. Nor did she review the "Rules and Regulations" document, a document discussed below which Magic City used as an "orientation checklist." See Doc. No. [171], p. 18, ¶328; see also Doc. No. [132-22], pp. 83–85, 119.  Instead, she believed that Magic City exercised "very little control over the dancers" based on "the facts, as they were presented to [her]." Doc. No. [132-31], p. 28. Finally, Aprin testified that Magic City treated dancers "the same before and after [she] drafted [the tenancy agreement]. Nothing changed in that respect." Id. p. 22.

In addition to the different contracts they signed, Plaintiffs were given a variety of supplemental documents when they began working for Magic City. The "Activity and Facility Use Agreement" provided that the dancers were generally to pay the club an "activity fee," also known as a "bar fee," each time they performed. See id. p. 84; see also id. p. 119. An addendum to the agreement laid out a fee schedule, which varied based on what days the dancers performed and when they arrived. See

6

<u>id.</u> pp. 90–91. The fee schedule also listed certain "House Rules," which provided that dancers who worked the first shift could not "leave without notifying Management until First Session end[ed] at 10:00pm" and that they would not "be admitted to dance after 5:00pm." <u>Id.</u> p. 90. The second shift fee schedule contained similar "House Rules," providing that dancers could not perform before 8:00 PM, that they could not leave without notifying the management, and that they would not be admitted to dance after 11:00 PM. <u>Id.</u> p. 91.

Dancers were given an evaluation form, which provided that the dancers would receive "monthly or quarterly evaluation review done by the immediate supervisor," evaluating areas such as the dancer's professionalism, customer service, "[t]oning of [b]ody, "[c]ostume and [s]hoes," and "[h]air and [m]ake-up." <u>Id.</u> p. 103. If dancers were "not in compliance" they could by given a variety of sanctions, including suspension, fines, or termination. <u>Id.</u> In another document, dancers acknowledged that, because Plaintiffs performed for Magic City, they "fully understand that [they] cannot dance for any other establishment in Fulton and DeKalb Counties." <u>Id.</u> p. 100. A document entitled "Magic City Independent Contractor Rules" stated that:

- "There will be no smoking downstairs at all. No food or glasses in the dressing room. $25.00 fine for all offenses.";

7

- "Failure to go on stage as called will result in no stage for rest of night [*sic*].";

- "There will be a roll call during the shift, in which all dancers will be accounted for. If you are not at roll call, you will be suspended.";

- "Loitering in the parking lot after hours will result in termination.";

- "All floor dances are $10.00 per song. Stage goes as follows: $10.00 for the top & $10.00 for the bottom.";

- "You will not have any excuse for being late for stage. You will be considered late if not on stage at the beginning of the first song. No exception.";

- "All dancers are required to go on stage, unless you indicated no stage when you come in the door.";

- "All dancers must stay the entire shift. Dayshift dancers can leave the floor to get dressed at 8:30 PM and the nightshift at 2:30 AM. No dancer can leave the building before the shift ends, except with managers [*sic*] approval."

Doc. No. [132-31], pp. 105–06.

Dancers also acknowledged receipt of a form laying out new-hire requirements, including a requirement that they "work dayshift at least three days a week during [their] 60 day probation period." Doc. No. [132-32], p. 11. Still another

document, prepared by a Magic City employee to aid in the orientation of new

dancers, was entitled "Rules and Regulations." See Doc. No. [132-22], pp. 83–85, 119.

The "Rules and Regulations" document contained a litany of "guidelines" including:

- dancers "must work 4 shifts per week out of 12 unless [they] have documentation of another job or are enrolled in school;"

- dancers can receive a free bar fee if they "are dressed and upstairs by 3pm or 8pm" but "must stay upstairs for the first hour" and were allowed to have their phone upstairs; and

- if dancers were "not signed in by 5pm on day shift, [they could] not work on day shift;"

Id. p. 119; see also id. pp. 83–84.

## C.   **Course of Conduct**

In hiring dancers, Defendants do not require any dancing experience or

demonstrated ability whatsoever. See Doc. No. [147-1], p. 81, ¶¶260–61. The principal

criteria by which dancers are selected are their willingness to disrobe without

hesitation and their physical attractiveness. Id. pp. 82–83, ¶¶264–68. Indeed, one

Magic City employee testified that Magic city "ha[s] some of the most beautiful

women in Atlanta" and is "known all over the world for that, for [its] girls, and how

they keep themselves." See Doc. No. [132-29], p. 56. As noted above, Magic City has

approximately 100–150 exotic dancers on its "roster" at any given time. Doc. No.

[147-1], p. 4, ¶4.A manager for Magic City testified that between 20 and 50 dancer's entertain at Magic City on any given night, and that it would be unusual if there were ever a time when the club was open without any dancers. Doc. No. [132-2], p. 20. One former dancer testified that it was "not uncommon" for dancers to only work for Magic City for six months. See Doc. No. [156], p. 52. However, numerous other dancers testified that they worked for Magic City for several years. See Doc. No. [155], pp. 10, 56; Doc. No. [156], pp. 20–21; Doc. No. [157], pp. 9–10; Doc. No. [158], pp. 9, 13; Doc. No. [159], p. 9; Doc. No. [160], p. 11; Doc. No. [162], p. 9; Doc. No. [163], p. 10; Doc. No. [164], pp. 49, 68.

Plaintiffs were paid directly by Magic City's customers, in cash. Doc. No. [147-1], pp. 88–89, ¶284. Defendants did not take any portion of the money Plaintiffs received from customers, nor did Magic City record any of the money dancers received as part of its gross receipts. Id. p. 89, ¶¶285–87. Magic City also does not keep track of the number of dances their entertainers perform, nor does it record the amount of tips dancers receive. Id. p. 90, ¶290. Magic City does not believe any of the money dancers receive belongs to Magic City; in the words of Defendant Brown, "that's all theirs" and Magic City has "nothing to do with their money, whatever they get." Id. pp. 89–90, ¶288.

10

Plaintiffs were responsible for providing their own costumes and for handling their own hair and makeup. See Doc. No. [149-2], pp. 21–22, ¶30. These expenses could be as much as several hundreds of dollars per week. See id. pp. 22–23, ¶31. Defendants, on the other hand, spent hundreds of thousands of dollars each year on rents, maintenance and repairs, and advertizing for the club. See Doc. No. [130-18], pp. 53–55, ¶¶235–38.

Although Aprin believed Magic City would only fine dancers for "some egregious behavior, like if a dancer fought with a customer or another dancer," Doc. No. [132-31], p. 25, the reality was quite different. Numerous dancers, and two of Magic City's own employees, testified that dancers were fined for staying in the dressing room too long. See Doc. No. [132-2], pp. 97–98; Doc. No. [132-3], pp. 17–19; Doc. No.[132-4], pp. 13–14; Doc. No. [132-6], p. 12–13;  Doc. No. [132-11], pp. 16–17; Doc. No. [132-27], p. 45–46. Moreover, numerous individuals, including a Magic City employee, testified that dancers were fined for not working at least a certain number of shifts per week. Doc. No. [132-2], pp. 16–18; Doc. No. [132-3], p. 17 Doc. No. [132-6], pp. 10–11; Doc. No. [132-11], p. 17; Doc. No. [132-14], pp. 9–10. Testifying on behalf of PEG, Defendant Brown admitted that dancers "[p]robably" were fined for such conduct, but explained that Magic City implemented the policy requiring

11

dancers to work a certain number of shifts per week because dancers who performed at Magic City "from [20]03 to [20]04" wanted the rule. Doc. No. [132-1], pp. 88–89.

Magic City put out memoranda saying that dancers must stay "on [their] A game," and that they would be required to have an individual meeting with the manager "to determine if [they] still meet the qualifications to be an entertainer at Magic City." Doc. No. [147-1], p. 59–60, ¶182. Defendant Brown admitted during his deposition for PEG that dancers have been told they have "60 days to get it tight," and that he "may have told [dancers] to tone up." Doc. No. [132-1], pp. 133, 136. Due to an "attitude problem" with some of the dancers, one of Magic City's employees drafted and posted a memorandum threatening the dancers with fines or suspension if management believed the dancers were "not performing to [its] standards." Doc. No. [132-22], p. 80–82; see also id. p. 118; Doc. No. [132-27], p. 67. However, the employee testified that she knew that Magic City would not "follow through" on the threats, and agreed that her intent behind the memorandum was to "scare" the dancers into compliance. Doc. No. [132-22], p. 81. She agreed that, in the end, it was Magic City's decision as to whether or not to fine or suspend the dancers. Id. 82.

The managers at Magic City were, indeed, responsible for disciplining entertainers. Doc. No. [132-1], pp. 14–15. They would use their discretion to decide whether or not a dancer received a fine. Doc. No. [132-29], pp. 26–27; Doc. No. [132-9],

p. 10; Doc. No. [132-12], p. 15. The club would also put entertainers on probation. <u>See</u> Doc. No. [132-1], p. 57. However, even when dancers were suspended by managers, Defendant Barney would "bring [them] back" and "try to give them a million chances." Doc. No. [132-15], pp. 67–68.

Dancers were required to go on stage in the order that they signed in with the club and were removed from the stage by management if they went on stage out of order. <u>See</u> Doc. No. [132-22], p. 36–37; Doc. No. [132-27], pp. 44–45, 68–69. Although dancers could often wear what they wanted, they were not allowed to wear certain outfits on certain days. Doc. No. [163], pp. 56–57. In particular, they were told they cannot wear "jean material on certain days." Doc. No. [132-14], p. 14. Additionally, Magic City sent dancers dozens of messages informing them that "everyone is required to wear a costume on Thursdays." <u>See</u> Doc. No. [132-58], pp. 7–8. Magic City also sent text messages informing dancers of a "pole class" and stating that "new dancers need to attend." <u>Id.</u> pp. 12–14.

Dozens of other text messages to dancers informed them of a "[m]andatory meeting." <u>See id.</u> pp. 4–5. Indeed, Magic City would periodically hold such meetings to let dancers know when Magic City managers "come[ ] up with something that they want done differently, or if they were concerned about something." Doc. No. [132-29], pp. 21–22; <u>see also</u> Doc. No. [162], p. 44 ("The meetings were just about keeping our

13

appearance up and talking to customers the right way, coming to work on time and not arguing."). Dancers were also fined if they missed these meetings. Doc. No. [162], pp. 43–44; Doc. No. [132-4], pp. 22–23; see also Doc. No. [132-27], pp. 48–49.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex, 477 U.S. at 325. In determining whether the moving party has met this burden, this Court must consider the facts in the light most

14

favorable to the nonmoving party. See Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir.2005).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id. (citations omitted). All reasonable doubts, however, are resolved in the favor of the nonmoving party. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III.   ANALYSIS

### A.   Plaintiffs' Employment Status

Defendants note that Plaintiffs "signed agreements explicitly defining their relationship with [Magic City] as either independent contractors or tenants," and argue that this fact "weighs in favor of finding that no employment relationship exists." Doc. No. [136-1], pp. 18–19. However, actions speak louder than words, and the parties actual conduct speaks louder than the talismanic legal-language used in a contract. Merely calling an employee an "independent contractor" or a "tenant" does not make it so for the purposes of the FLSA. See Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1311 (11th Cir. 2013). Instead, this Court looks to the "economic

15

reality" of the situation to determine a person's employment status. Id. Six factors

guide the Court in conducting this "economic reality" inquiry:

> 1. the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> 2. the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> 3. the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> 4. whether the service rendered requires a special skill;
>
> 5. the degree of permanency and duration of the working relationship; and
>
> 6. the extent to which the service rendered is an integral part of the alleged employer's business.

Id. at 1311–12.

These factors "are not exclusive and no single factor is dominant." Id. at 1312.

Rather, the overarching consideration of the "economic reality" inquiry is whether

"the relationship between the alleged employee and alleged employer . . .

demonstrates [economic] dependence." Id. at 1311. "Ultimately, in considering

economic dependence, the court focuses on whether an individual is 'in business for

himself' or is 'dependent upon finding employment in the business of others.'" Id.

at 1312 (quoting Mednick v. Albert Enters., Inc., 508 F.2d 297, 301–02 (5th Cir.1975)).

16

In all of their briefing on these motions, Defendants point to only two, unpublished cases from district courts in other circuits where exotic dancers were held not to be employees under the FLSA. See Hilborn v. Prime Time Club, Inc., 2012 WL 9187581 (E.D. Ark. July 12, 2012); Matson v. 7455, Inc., 2000 WL 1132110 (D. Or. Jan. 14, 2000). In both of these cases, the analysis does not cite to or discuss any law beyond a conclusory application of the "economic realities" test. See Hilborn, 2012 WL 9187581, at *1; Matson, 2000 WL 1132110, at *4. This Court has serious concerns about the legal reasoning in these cases, and has found no other case supporting Defendant's position.

Instead, numerous other courts have provided detailed analysis of the issue and have held that exotic dancers are employees under the FLSA. In particular, this Court has found a dozen such well-reasoned cases, including several from this Circuit. See Reich v. Circle C. Investments, Inc., 998 F.2d 324, 328 (5th Cir. 1993); McFeeley v. Jackson St. Entm't, LLC, 47 F. Supp. 3d 260, 273 (D. Md. 2014); Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901 (S.D.N.Y. 2013); Clincy v. Galardi S. Enterprises, Inc., 808 F. Supp. 2d 1326 (N.D. Ga. 2011); Thompson v. Linda And A., Inc., 779 F. Supp. 2d 139, 151 (D.D.C. 2011); Harrell v. Diamond A Entm't, Inc., 992 F. Supp. 1343, 1350 (M.D. Fla. 1997); Reich v. Priba Corp., 890 F. Supp. 586, 592 (N.D. Tex. 1995); Stevenson v. Great Am. Dream, Inc., 2013 WL 6880921 (N.D. Ga. Dec. 31, 2013); Butler v. PP & G, Inc., 2013 WL 5964476 (D. Md. Nov. 7, 2013); Morse v. Mer

17

Corp., 2010 WL 2346334 (S.D. Ind. June 4, 2010); Martin v. Priba Corp., 1992 WL
486911 (N.D. Tex. Nov. 6, 1992); Donovan v. Tavern Talent & Placements, Inc., 1986
WL 32746 (D. Colo. Jan. 8, 1986). This Court agrees with the great weight of the
authority, and concludes that, based on the undisputed facts of this case, Plaintiffs are
employees under the FLSA.

1.     *The Nature and Degree of Control*

Defendants argue, "To avoid chaos, Magic City has implemented minimally
restrictive yet entirely necessary guidelines and expectations for its entertainers."
Doc. No. [147], p. 6. Defendants' rules prohibiting dancers from fighting and
instructions to dancers that they must comply with local laws and regulations
certainly fall under this category. See,e.g., Doc. No. [132-15], pp. 72–73; Doc.
No. [132-27], p. 69; Doc. No. [147-1], p. 53, ¶ 166. If these were the only kind of rules
Magic City imposed on dancers, the level of control it exercised almost certainly
would not rise to the level of an employer-employee relationship. After all, a
company can prevent its customers from fighting and breaking the law without the
customers becoming employees. But Magic City went much farther than this.

Dancers were fined if they stayed in the dressing room too long or did not get
to the dance floor quickly enough. Doc. No. [132-2], p. 97–98; Doc. No. [132-3], pp.
17–19; Doc. No. [132-4] pp. 13–14; Doc. No. [132-6], p. 12–13; Doc. No. [132-11], pp.
16–17; Doc. No. [132-27], p. 45–46. They were "probably" also fined for not working

18

at least a certain number of shifts per week. See Doc. No. [132-1], pp. 88–89; see also Doc. No. [132-2], pp. 16–18; Doc. No. [132-3], p. 17 Doc. No. [132-6], pp. 10–11; Doc. No. [132-11], p. 17; Doc. No. [132-14], pp. 9–10. Dancers were also required to attend "[m]andatory meeting[s]" to discuss issues that arose. See Doc. No. [132-29], pp. 21–22; Doc. No. [162], p. 44; see also Doc. No. [132-58], pp. 4–5. They were fined if they missed the meetings. Doc. No. [162], pp. 43–44; Doc. No. [132-4], pp. 22–23; see also Doc. No. [132-27], pp. 48–49. Dancers were threatened with fines or suspension if management believed the dancers were "not performing to [its] standards." Doc. No. [132-22], p. 80–82; see also id. p. 118; Doc. No. [132-27], p. 67. Indeed, the sheer volume of "Independent Contractor Rules," "Rules and Regulations," and "House Rules" imposed by Magic City belies any contention that these rules were "minimally restrictive" and only intended to "avoid chaos." See Doc. No. [132-31], pp. 90–91, 105–06; Doc. No. [132-22], pp. 83–85, 119.

Defendants respond that many of their rules "were not mandatory and were laxly enforced." Doc. No. [147], p. 7. There is certainly evidence to support this assertion. The Magic City employee who drafted the memorandum threatening dancers with fines or suspension testified that she knew that Magic City would not "follow through" on the threats, and agreed that her intent was to "scare" the dancers into compliance. Doc. No. [132-22], p. 81. Defendant Barney testified that, even when dancers were suspended by managers, he would "bring [them] back" and "try to give

19

them a million chances." Doc. No. [132-15], pp. 67–68. However, simply because a manager may be kind, and may decide not to strictly enforce every rule on every occasion, does not change the fact that the manager is exercising control over the subordinate. Magic City's managers had the ability to decide, in his or her discretion, when and how to enforce the long list of rules created by Magic City. <u>See</u> Doc. No. [132-9], p. 10; Doc. No. [132-12], p. 15; Doc. No. [132-29], pp. 26–27; <u>see also</u> Doc. No. [132-22], 82. These facts weigh in favor of a finding of control because, "while the rules may not be enforced consistently or uniformly, the Club's management has the authority to fine or otherwise discipline entertainers for not complying with the rules, and has done so." <u>Clincy</u>, 808 F Supp. 2d at 1345.

Defendants' argument that "Plaintiffs have near complete autonomy in determining how to dance on stage" is likewise unavailing. <u>See</u> Doc. No. [147], p. 8. Simply because a worker may have "near complete autonomy" in deciding how to perform the minutiae of some aspect of her job does not mean that she is an independent contractor. A manager does not need to oversee every customer interaction for a cashier to be considered an employee. As the <u>Harrell</u> Court noted, "The mere fact that [the club] delegated a measure of discretion to its dancers does not necessarily mean that its dancers are elevated to the level of independent contractors. Indeed, one could say that the nature of a dancer's job requires some measure of discretion and flexibility." 992 F. Supp. at 1349.

20

Finally, Defendants contend that they do not exercise control over Plaintiffs, because they do not control Plaintiffs' work schedule or appearance. Doc. No. [147-1], pp. 11–12. However, the undisputed evidence is that Defendants exercised some control over both Plaintiffs' work schedule and their appearance. As noted above, Defendant Brown admitted that were "probably" also fined for not working at least a certain number of shifts per week. See Doc. No. [132-1], pp. 88–89; see also Doc. No. [132-2], pp. 16–18; Doc. No. [132-3], p. 17 Doc. No. [132-6], pp. 10–11; Doc. No. [132-11], p. 17; Doc. No. [132-14], pp. 9–10. Dancers were instructed to wear costumes on certain days of the week. Doc. No. [132-58], pp. 4–5. They were allowed perform wearing certain outfits on some days, but not others, at the discretion of the Magic City managers. Doc. No. [132-14], p. 14; Doc. No. [163], pp. 56–57.

If a manager felt that a dancer had gained too much weight, she might be told to "tone up" or that she had "60 days to get it tight." See Doc. No. [132-1], pp. 133, 136. Indeed, one memorandum from Magic City told dancers that they would be required to have an individual meeting with a manager "to determine if [they] still meet the qualifications to be an entertainer at Magic City." Doc. No. [147-1], p. 59–60, ¶182. The evaluation form given to dancers indicated that they would receive "monthly or quarterly evaluation review done by the immediate supervisor," evaluating areas such as the dancer's professionalism, customer service, "[t]oning of [b]ody, "[c]ostume and [s]hoes," and "[h]air and [m]ake-up." Doc. No. [132-31], p.

21

103. As in <u>Butler</u>, Magic City "does not create work schedules for the dancers," nor did it "mandate that [dancers] dress or dance a certain way." 2013 WL 5964476 at *3. Nevertheless, although Magic City "does not exercise control over the day-to-day decisions and work of its dancers, it exercises significant control over the atmosphere, clientele and operation of the club. Thus, this factor likely tips in favor of economic dependence." <u>Id.</u> at *4.

### 2.   *Opportunity for Profit or Loss*

Defendants argue that Plaintiffs are not employees because they have substantial control over their own profits and losses. In particular, Defendants assert that "Plaintiffs' earnings depend almost entirely upon their own initiative" because Plaintiffs must "start conversations with and entertain patrons." Doc. No. [147], p. 13. However, simply because dancers may "increase their earnings by exercising initiative does not necessarily indicate that dancers are independent contractors." <u>McFeeley</u>, 47 F. Supp. 3d at 270. As the <u>Harrell</u> Court explained:

> That a dancer may increase her earnings by increased 'hustling' matters little. As is the case with the zealous waiter at a fancy, four star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service; ultimately, it is the restaurant that takes the risks and reaps the returns.

992 F. Supp. at 1352.

22

Moreover, the only risk of loss Plaintiffs incurred was the "bar fee" they were required to pay Defendants to perform, while Defendants risked the hundreds of thousands of dollars they spent every year on rents, maintenance and repairs, and advertizing for the club. See Doc. No. [130-18], pp. 53–55, ¶¶235–38. Just as in Harrell, a dancer risks nothing more than a minor fee, and the club "would have us believe that a dancer . . . could hang out her own shingle, pay nothing in overhead—no advertising, no facilities, no bouncers—and draw in a constant stream of paying customers." 992 F. Supp. at 1352.

It is not enough that Plaintiffs did some very minor work to "promote themselves" and can "show extra initiative" in an effort to increase tips. See McFeeley, 47 F. Supp. 3d at 271. Defendants were primarily in control of Plaintiffs' opportunity for profit because they controlled the "advertisement, location, business hours, maintenance of facilities, aesthetics, and inventory of beverages and food." See Reich, 998 F.2d at 328. Accordingly, this factor also weighs heavily in favor of Plaintiffs.

**3.     *Investment in Equipment or Materials***

Defendant contends that "courts within the 11th Circuit analyze the amount invested by comparing the amount the alleged non-employee spent to the amount that would typically be invested by an employee within the same business." Doc. No. [147], p. 14. In support of this position, Defendants cite Freund v. Hi-Tech Satellite,

23

Inc., 185 F. App'x 782, 784 (11th Cir. 2006) (*per curiam*). However, nothing in that case suggests the proposition Defendants assert. Rather, the district court in <u>Freund</u> decided that an installer was an independent contractor because he "procured all of the equipment necessary to perform the installations" and, although he personally did not hire any workers, other installers who worked for the defendant did. <u>Id.</u> at 783–84.

Here, Defendants do not argue that any dancer ever hired subordinate workers to help her dance for Magic City. Plaintiffs also did not "procure all of the equipment necessary to perform" their duties. While they bought outfits and paid for their own hair and makeup, they needed more to perform their duties—they needed *somewhere* to perform. That was provided by Defendants who not only invested vast sums discussed above on rents, maintenance and repairs, and advertizing for the club, but also provided bouncers to protect the dancers from rowdy customers and bartenders to ply the customers with drinks. <u>See, e.g.,</u> Doc. No. [149-2], pp. 2–3, ¶3. In discussing the issue of the relative investment, the <u>Harrell</u> Court noted, "The courts which have addressed this factor have universally concluded that a dancer's investment is minor when compared to the club's investment." 992 F. Supp. at 1350. In this case too, the dancers' investments pale in comparison to those of Defendants. This factor weighs in favor of a finding that Plaintiffs were economically dependent on Defendants.

24

**4.** *Special Skill*

Defendants argue, "Plaintiffs undoubtedly posses a special skill." Doc. No. [147], p. 16. However, the record belies such an assertion. Defendants do not require any dancing experience or demonstrated ability whatsoever. See Doc. No. [147-1], p. 81, ¶¶260–61. Rather, the principal criteria by which dancers are selected are their physical attractiveness and their willingness to disrobe without hesitation. Id. pp. 82–83, ¶¶264–68. Defendants other contention—that Plaintiffs' "own initiative largely drives their revenue"—is no more persuasive. See Doc. No. [147], p. 16. While "efforts by dancers to cultivate customers surely enhanced the money the customers paid them, such 'hustling' is not skilled work." Hart, 967 F. Supp. 2d at 920. Indeed, "every court to consider such a 'hustling' argument by a strip-club proprietor has rejected it." Id.; see also Thompson, 779 F. Supp. 2d at 149 ("Many other courts have previously found that little specialized skill is required to be a nude dancer."). Thus, this factor also weighs in favor of Plaintiffs' argument that they are employees.

**5.** *Permanency and Duration of the Relationship*

One former dancer acknowledged that it was "not uncommon" for dancers to work for Magic City for only six months. Doc. No. [156], p. 52. However, numerous Plaintiffs worked for Magic City for several years. See Doc. No. [155], pp. 10, 56; Doc. No. [156], pp. 20–21; Doc. No. [157], pp. 9–10; Doc. No. [158], pp. 9, 13; Doc. No. [159], p. 9; Doc. No. [160], p. 11; Doc. No. [162], p. 9; Doc. No. [163], p. 10; Doc. No. [164],

25

pp. 49, 68. While it is true that entertainers were allowed to perform at other clubs, at least some of the dancers signed an agreement not to perform for Magic City's direct competitors in Fulton and DeKalb counties. <u>See</u> Doc. No. [132-31], p. 100. Overall, this factor does not weigh heavily in favor of one side or the other. As courts have noted, "exotic dancers tend to be itinerant," and thus courts "tend to place less emphasis on this factor." <u>Harrell</u>, 922 F. Supp. at 1352.

**6.    *Integral Part of Alleged Employer's Business***

Defendants argue that Plaintiffs were not an integral part of Magic City's business because Magic City's "main source of revenue is derived from alcohol sales at the bar rather than entertainer-paid fees." Doc. No. [136-1], p. 18. Courts have uniformly characterized such arguments as "simply unconvincing," <u>Morse</u>, 2010 WL 2346334, at *6, "absurd," <u>Clincy</u>, 808 F. Supp. 2d at 1349, and "fl[ying] in the face of logic," <u>Butler</u>, 2013 WL 5964476, at *5. This Court agrees. "Exotic dancers are obviously essential to the success of a topless nightclub." <u>Harrell</u>, 992 F. Supp. at 1352.

One of Magic City's own managers testified that between 20 and 50 dancer's entertain at Magic City on any given night, and that it would be unusual if there were ever a time when the club was open without any dancers. Doc. No. [132-2], p. 20. Another Magic City employee testified that Magic City is "known all over the world for . . . [its] girls, and how they keep themselves." <u>See</u> Doc. No. [132-29], p. 56. While

26

PEG may make most of its money through alcohol sales, it is clear that the primary reason Magic City has so many customers in the first place is the entertainment provided by the exotic dancers. Their role is essential to Magic City's business.

**7.**   *Weighing the Factors*

Five of the six factors laid out in <u>Scantland</u> weigh in favor of Plaintiffs' argument that they are employees under the FLSA, while the remaining factor does not weigh heavily in favor of either party. <u>See</u> <u>Scantland</u>, 721 F.3d at 1311–12. More than simply a mechanical calculation, however, the undisputed facts of this case clearly demonstrate that Plaintiffs were economically dependent on Defendants, which is the overarching consideration of the "economic reality" inquiry. <u>See</u> <u>id.</u> at 1311. Plaintiffs were quite clearly not "in business for [themselves]," but were "dependent upon finding employment in the business of others." <u>See</u> <u>id.</u> at 1312. Accordingly, the Court holds that, as a matter of law, Plaintiffs were employees within the meaning of the FLSA.

**B.**   <u>**Defendants' Defenses and Counterclaims**</u>

Plaintiffs' Motion for Summary Judgment also seeks judgment on Defendants' offset defense and their counterclaims against Plaintiffs. <u>See</u> Doc. No. [131-2], pp. 20–29. Defendants, in turn, seek summary judgment on the issues of whether their

27

violations of the FLSA were willful, and whether they acted in good faith, as a matter of law. See Doc. No. [136-1], pp. 21–23.[2]

### 1.   *Offset Defense*

As one of their defenses, Defendants argue that Plaintiffs "earned at least the applicable federal minimum wage for every hour worked." Doc. No. [55], p. 6; see also Doc. No. [76], p.2. However, Plaintiffs argue, in their Motion for Summary Judgment, that the tips they received cannot be counted by Defendants' in an attempt to retroactively satisfy their obligation to pay Plaintiffs the federal minimum wage. Doc. No. [131-2], pp. 22–25. Plaintiffs are entitled to summary judgment on this issue because they are correct that Defendants cannot use the tips received by Plaintiffs to offset their minimum-wage obligations under the FLSA.

The Department of Labor, Wage and Hour Division, regulation on the issue provides that compulsory "service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the [FLSA]," and

---

[2] In their Motion for Summary Judgment, Defendants also argue that certain Plaintiffs have not provided adequate support for their allegations that they ever performed at Magic City. Doc. No. [136-1], pp. 19–21. As a general matter, plaintiffs in a class action, such as the case at bar, may satisfy their evidentiary burden by pointing to representative evidence. See Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1278–79 (11th Cir. 2008). Thus, it is not appropriate for this Court to consider whether or not Plaintiffs can individually prove damages, at this stage in the litigation. The Court notes, however, that Defendants can move for decertification of any Plaintiffs not properly a part of the class within fourteen (14) days of the entry of this order. Doc. No. [178]. Finally, the Court has entered an order addressing some of these Plaintiffs' failure to comply with discovery. Doc. No. [182]. At least one of those plaintiffs has already withdrawn from the case. Doc. No. [188].

AO 72A
(Rev.8/82)

that when "such sums are distributed by the employer to its employees . . . they may be used in their entirety to satisfy the monetary requirements of the [FLSA]." 29 C.F.R. § 531.55(b). It is beyond dispute that the fees were not collected and distributed by Defendants, nor were they included in Defendants' gross receipts. Doc. No. [147-1], pp. 88–90, ¶¶284–90. However, Defendants argue that this does not preclude them from counting the mandatory table-dance fees as service charges that offset their minimum-wage obligations. See Doc. No. [147], p. 21.

The plain language of the FLSA regulation at issue, and the substantial weight of the cases interpreting that regulation, counsel against Defendants' proposed interpretation. Indeed, the only case that arguably supports Defendants' position is the Matson case mentioned above. 2000 WL 1132110. The Court has already expressed its concerns about the legal reasoning in that case, and the section of the Matson case dealing with § 531.55 is also not persuasive. First, that section of the opinion is acknowledged as *dicta* because the court decided the plaintiff was not an employee. Id. at *5. Moreover, although the court states that "[n]o limitation in the [FLSA] exists precluding the use of such fixed fees in the calculation of an employee's minimum wage," the court nowhere discusses subsection (b) of § 531.55. See id. at *6.

Subsection (b) of § 531.55 clearly provides that service charges are those sums "which become part of the employer's gross receipts" and "are distributed by the employer to its employees." 29 C.F.R. § 531.55(b). The plain language of the

29

regulation indicates that an employer needs to include such service fees in its gross receipts in order to count the amount toward the employer's minimum-wage requirement. Indeed, all courts interpreting this subsection have reached the same conclusion. See Henderson v. 1400 Northside Drive, Inc., 110 F. Supp. 3d 1318, 1323 (N.D. Ga. 2015) (holding that "to constitute a service charge and therefore be properly applied against an establishment's statutory minimum-wage duty, it must have been included in the establishment's gross receipts") (quoting Hart, 967 F. Supp. 2d at 929); McFeeley, 47 F. Supp. 3d at 277 (noting that "whether performance fees were accurately tracked by [the employers]" was "central to the determination of whether the performance fees . . . constitute wages"); Reich, 890 F.Supp. at 595 ("The fact that all of the table dance fees are not reported as gross receipts is fatal to Cabaret Royale's claim that the tips are more properly classified as wages."); Reich v. ABC/York–Estes Corp., No. 91 C 6265, 1997 WL 264379, at *5 (N.D.Ill.1997) ( "This court agrees ... that an employer must include payments in its records as gross receipts as a prerequisite to 'service charge' classification under the FLSA.").

Even cases cited by Defendant support the conclusion that an employer must include the service charges in its gross receipts. See Ruffin v. Entm't of the E. Panhandle, 845 F. Supp. 2d 762, 768 (N.D.W. Va. 2011) (noting that "an employer must include payments in its records as gross receipts as a prerequisite to 'service charge' classification under the FLSA"); Thornton v. Crazy Horse, Inc., 2012 WL

30

2175753, at *10 (D. Alaska 2012)(holding that the portion of a fee "recorded in the club's gross receipts" was a service charge, and the portion of the fee "not recorded in the clubs gross receipts" was a tip). The other cases cited by Defendants in support of their position dealt with situations where the employer asserted counterclaims against the Plaintiff, not where the employer attempted to use tips received by Plaintiffs to offset minimum-wage obligations. See Geter v. Galardi S. Enterprises, Inc., 43 F. Supp. 3d 1322, 1327 (S.D. Fla. 2014)(addressing an unjust enrichment counterclaim, and not discussing 29 C.F.R. § 531.55); Doe v. Cin-Lan, Inc., 2010 WL 726710, at *6 (E.D. Mich. 2010)(holding that 29 C.F.R. § 531.55(b) was inapplicable because the employer was explicitly not asserting that it could pay the plaintiff a reduced minimum wage). While Defendants cannot count the table fees as "service charges" under § 531.55—because they did not collect the fees, record them in their gross receipts, and distribute them to Plaintiffs—Defendants unjust enrichment counterclaim presents a closer call.

**2.**  *Counterclaims*

Defendants have filed a counterclaim alleging that Plaintiffs have been unjustly enriched by keeping the table dance fees and tips they received. Doc. No. [55], pp. 18–19, ¶¶33–38. Plaintiffs argue, in part, that they were not unjustly enriched by Defendants because they received the monies at issue directly from customers, not from Defendants. Doc. No. [131-2], p. 28. However, under Georgia law, a "benefit"

31

is "any form of advantage" for purposes of an unjust enrichment claim. Jones v. White, 311 Ga. App. 822, 828, 717 S.E.2d 322, 328 (2011). Thus, Defendants need not show that they paid money directly to Plaintiffs, only that they conferred some "benefit." Defendants have at least a plausible claim that the "benefit" they conferred on Plaintiffs was allowing Plaintiffs to perform at Magic City, receiving tips from Magic City's customers.

Still, Defendants must show more than that they conferred a benefit on Plaintiffs. Under Georgia law, "unjust enrichment is basically an equitable doctrine" based on the principle "that the benefitted party equitably ought to either return or compensate for the conferred benefits when there was no legal contract to pay." Hollifield v. Monte Vista Biblical Gardens, Inc., 251 Ga. App. 124, 130, 553 S.E.2d 662, 669 (2001). The Court notes that a counterclaim for unjust enrichment may be totally unavailable in this case because the relationship between the parties was covered by the various contracts the Plaintiffs signed. See Bonem v. Golf Club of Ga., Inc., 264 Ga. App. 573, 578, 591 S.E.2d 462, 467–68 (2003) (holding that where "[a] legal contract governs the dispute at issue" a party "may not rely on unjust enrichment"). Under those contracts, Plaintiffs were obligated to pay the bar fees or "activity fees" in exchange for the benefit of being allowed to perform at Magic City. See, e.g., Doc. No. [132-31], pp. 84–85, 90–91. Defendants do not allege that Plaintiffs received the

32

alleged benefit while wrongfully withholding these bar fees, and, even if they did, the claim would be one for breach of contract.

There are still more problems with Defendants' counterclaim for unjust enrichment. For example, an award of damages for unjust enrichment must "be supported by evidence from which it can be determined to a reasonable certainty that the [party receiving the benefit] in fact realized such a gain." Phoenix Airline Servs., Inc. v. Metro Airlines, Inc., 194 Ga. App. 120, 125-26, 390 S.E.2d 219, 225 (1989), *rev'd on other grounds*, 260 Ga. 584, 397 S.E.2d 699 (1990). Here, Defendants cannot prove with any "reasonable certainty" the value of the "benefits" they conferred on Plaintiffs. Defendants cannot be entitled to the full amount of tips Plaintiffs received because that is not the "benefit" they conferred on Plaintiffs. Plaintiffs tips were largely based on factors entirely outside of Defendants' control, namely the skill with which Plaintiffs performed and the generosity of Magic City's customers. While Defendants are partially responsible for the tips Plaintiffs received—because they provided Plaintiffs with a place to perform—they offer no evidence of the value of that "benefit."

At best, Magic City may be able to argue that it guaranteed Plaintiffs at least $10 in tips each time they performed a table dance, because this was the fee Defendants required from its patrons. However, Magic City cannot offer any proof of how many table dances Plaintiffs performed, or how much Plaintiffs received in

33

tips, because Defendants have no such records. See Doc. No. [147-1], p. 90, ¶290. Indeed, until they filed these counterclaims, Magic City never asserted that any of the money dancers receive belonged to it. Id. pp. 89–90, ¶288. Defendants have no proof for the very same reason they cannot count Plaintiffs' tips as "service charges" under the FLSA—because they did not keep track of the amount in their gross receipts.

This leads to the yet another reason for the Court's conclusion that Defendants' counterclaim for unjust enrichment must fail. Unjust enrichment is ultimately an equitable doctrine, and "[w]hen a party comes into court with unclean hands, equity will not grant relief to such party." Hollifield, 251 Ga. App. at 127, 553 S.E.2d at 667. As this Court concluded above, Defendants violated the FLSA by treating Plaintiffs as independent contractors and not as employees entitled to a minimum-wage. If Defendants were unsure how to classify Plaintiffs, they could have had contingency provisions in the contracts, or they could have followed the requirements in the FLSA for treating the table-dance fees as "service charges" to offset their minimum wage obligations. Defendants decided to take a risk by misclassifying Plaintiffs, and they cannot now punish Plaintiffs because their gamble failed.

Defendants' counterclaim for breach of contract also fails. Defendants argue, in part, that Plaintiffs breached their contracts by suing Defendants for violations of the FLSA. See Doc. No. [147], p. 22. Even if the dancers wanted to waive their protections under the FLSA, which they vehemently do not, the protections of the

34

FLSA must "be applied even to those who would decline its protections." Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 302, 105 S. Ct. 1953, 1962, 85 L. Ed. 2d 278 (1985). To allow employers to simply defeat the application of the FLSA through contracts of adhesion would render the protections that statute entirely toothless. Thus, to the extent that the contracts signed by Plaintiffs contained a provision preventing them from suing for violations of the FLSA, such provision is void as against public policy.

Defendants also argue that Plaintiffs breached their contracts because they did not follow the alternative dispute resolution mechanisms laid out in the contracts before filing suit. See Doc. No. [55], pp.16–17, ¶¶25–27. Plaintiffs do not dispute that they failed to follow the dispute resolution mechanisms in their contracts, but instead argue that it "defies common sense to think . . . these allegations could constitute a material breach." See Doc. No. [132-2], p. 27 n.7. This Court agrees that, while Plaintiffs may have committed a technical violation of their contracts by not following the dispute resolution mechanisms, such a violation cannot sustain a breach of contract counterclaim under the facts of this case. Georgia law requires more than a mere technical violation of a contract; Defendants must show that Plaintiffs committed a material breach. See Dennard v. Freeport Minerals Co., 250 Ga. 330, 297 S.E.2d 222, 224 (1982) ("Our general rule with respect to compliance with contract terms is not strict compliance, but substantial compliance."); O.C.G.A. § 13–4–20

("Performance, to be effectual, . . . must be substantially in compliance with the spirit and the letter of the contract . . . .").

Defendants make no absolutely no argument as to how they have been harmed in any way by this alleged breach of contract. At best, Defendants could have requested this Court order the parties to attend mediation prior to any further litigation. But the fact is that the parties agreed among themselves to stay the proceedings in this case so that they could attend mediation. See Doc. No. [21]. Plaintiffs failure to comply with the dispute resolution provision did not defeat their effectual performance of their obligations under the contract, and thus the dispute resolution mechanism was simply not a material part of the agreement. See Dennard, 250 Ga. at 297 S.E.2d at 224; O.C.G.A. § 13–4–20. As with Defendants' argument about the failure to comply with the dispute resolution mechanism, so too with their argument that Plaintiffs failed to pay their taxes in accordance with the agreement. It cannot seriously be argued that Plaintiffs failure to pay taxes was a material breach of their performance contracts, and Defendants were not harmed by Plaintiffs actions in any way, shape, or form. Accordingly, Defendants' breach of contract counterclaim also fails as a matter of law.

**3.**   *Good-Faith Defense and Statute of Limitations*

The statute of limitations for claims seeking unpaid wages under the FLSA is generally two years unless the plaintiff can show that the claim arises "out of a willful

violation" of the FLAS, in which case the statute of limitations is three years. <u>See</u> <u>Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.</u>, 515 F.3d 1150, 1162-63 (11th Cir. 2008). To establish that a violation of the Act was willful, a plaintiff must prove by a preponderance of the evidence that the employer either knew its conduct was prohibited by the statute or showed reckless disregard about whether it was. <u>Id.</u> at 1164; <u>see</u> <u>also</u> <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 133 (1988). "Reckless disregard" is defined by the Code of Federal Regulations as the "failure to make adequate inquiry into whether conduct is in compliance with the [FLSA]." 5 C.F.R. § 551.104. Proof that an employer was "merely negligent" or that the employer "act[ed] unreasonably" is not enough to show reckless disregard. <u>McLaughlin</u>, 486 U.S. at 133–35, 108 S.Ct. at 1681–82.

Defendants argue that, as a matter of law, their decision to classify Plaintiffs as independent contractors and "tenants" cannot be considered a willful violation of the FLSA because Defendants received advice from their counsel stating that they were in compliance with the FLSA. <u>See</u> Doc. No. [136-1], p. 23. Plaintiffs, in turn, argue that Defendants cannot rely merely on the fact that their attorneys drafted the agreements signed by Plaintiffs because Defendant's attorneys "did not observe or interview entertainers, interview management, or review relevant policies and memorandums." <u>See</u> Doc. No. [149], p. 22. Defendants reply, in part, that their attorneys did more than

merely "draft[ ] a contract" — at least one of their attorneys "investigated the realities of the relationship between Magic City and the performers." See Doc. No. [169], p. 7.

As a general proposition, courts in this Circuit have assumed that the question of willfulness is one for the jury. See, e.g., Alvarez Perez, 515 F.3d at 1163 n.3. This Court assumes the same. While Defendants present fairly strong arguments on this point, there is at least enough evidence in support of Plaintiffs' position that a reasonable jury could decide that Defendants' actions were willful violations of the FLSA. The mere fact that attorneys drafted written contracts for Defendants does not necessarily demonstrate that Defendants' violations of the FLSA were not willful. As this Court noted above, the particular language used in a contract is not determinative of whether an employer's actions violate the FLSA. See Scantland, 721 F.3d at 1311. Defendants must show more than that they simply received advice from counsel; they must show that they disclosed necessary facts to their attorneys and that they followed their attorneys' advice.

There is no evidence that, before drafting the initial Independent Contractor Agreement, Roberts did anything more than conduct some legal research on the issue. He testified that he could not recall if he made any independent assessment of whether the way Defendants were treating the dancers was consistent with the FLSA. See Doc. No. [132-30], pp. 24–25. Nor could he recall if he interviewed any of Magic City's managers about their interactions with the dancers, but he did recall that he

38

never actually observed the managers' interactions with the dancers. <u>Id.</u> pp. 26–27. Roberts also could not recall whether he ever reviewed Magic City's "Violation List," its "Independent Contractor Rules," or its "Rules and Procedures" list. <u>See id.</u> pp. 41–42. Thus, the evidence does not show that Roberts was privy to any of the material facts that would have allowed him to make an accurate assessment of whether Magic City could classify the dancers as independent contractors given the "economic realities" of the relationship between Magic City and the dancers.

Moreover, in doing research on the issue of whether Magic City could classify the dancers as independent contractors, Roberts reviewed the <u>Harrell</u> case, discussed above. <u>See id.</u> p. 17; <u>see also</u> <u>id.</u> pp. 83–98. He further testified that he could not recall if the <u>Harrell</u> case was included in the case law he provided to Magic City, but he "assumed that it was." <u>Id.</u> pp. 36–37. Because Defendants are seeking summary judgment on this issue, this Court must construe the facts in favor of Plaintiffs. <u>See Robinson</u>, 415 F.3d at 1257. Thus, the Court assumes that Defendants were aware of the <u>Harrell</u> case, which noted that courts had "universally" rejected some of the very arguments advanced by Defendants. <u>See</u> <u>Harrell</u>, 992 F. Supp. at 1350. These facts militate in favor of a finding that Defendants knew, or clearly should have known, their actions were in violation of the FLSA.

Then, in the immediate aftermath of the <u>Clincy</u> decision, where a court in this district held that a club improperly characterized its dancers as independent

contractors, Defendants changed their contract from an independent contractor agreement to a "tenancy" relationship.  Defendant Barney testified that he was aware of the <u>Clincy</u> decision, although he stated that he did not know of the particular facts of the case. Doc. No. [132-27], p. 100–01. However, again, the Court must construe this fact in favor of Plaintiffs since it is Defendants who are moving for summary judgment on this issue. <u>See Robinson</u>, 415 F.3d at 1257. A reasonable jury could find that Defendants intended to circumvent the <u>Clincy</u> decision by classifying the dancers as "tenants" because they were aware that they could not classify them as independent contractors. Aprin herself testified that she was "quite aware" of the <u>Clincy</u> decision. Doc. No. [132-31], p. 21. She also testified that she made Defendants aware of several cases holding that dancers could not be classified as independent contractors under the FLSA. <u>See id.</u> p. 34. It was Aprin's believe that Magic City should not "should continue to classify [the dancers] as independent contractors." <u>Id.</u> p. 21.

Although Aprin ultimately changed the language used in the contract, she testified that nothing about the actual relationship between Magic City and its dancers changed. <u>Id.</u> p. 22. As the Court has repeatedly noted, simply changing the language in the contract does not allow Defendants to avoid the FLSA's minimum-wage obligations where the economic realities of the relationship are the same. While Aprin felt that Defendants could classify the dancers as tenants, because "they did

40

not exercise very much control over the dancers," she based this belief on "the facts, as they were presented to [her]." Id. pp. 28, 34. Aprin testified that she did not advise Magic City about requiring dancers to work a certain number of days per week or whether Magic City should determine the order in which dancers performed, and testified that she could not recall if she advised Magic City about whether it could require entertainers to wear certain clothing. Id. pp. 24–25. She did not actually observe how Magic City conducted its business, nor did she review the "Rules and Regulations" document used as an "orientation checklist." Id. pp. 26–27; Doc. No. [171], p. 18, ¶328; see also Doc. No. [132-22], pp. 83–85, 119. While Aprin believed Magic City would only fine dancers for "some egregious behavior, like if a dancer fought with a customer or another dancer," Doc. No. [132-31], p. 25, a reasonable jury could find that Magic City in fact fined dancers for a litany of violations, including taking too long in the dressing room, failing to attend mandatory meetings, and not working enough shifts per week.

In short, this Court cannot say that, as a matter of law, Defendants violations of the FLSA were not willful. Although Defendants claim that they acted on advice of counsel, there is ample evidence for a jury to find that the attorneys were not advised of crucial facts and were merely used to draft legal agreements that did not comport with the economic realities of the relationship between Magic City and the entertainers. A jury must decide whether Defendants willfully violated the FLSA, and

41

thus whether the statute of limitations can be extended to three years.[3] This is not an issue appropriate for summary judgment.

As the Eleventh Circuit has explained, if a jury concludes that a defendant's actions are "willful" with respect to the limitations period, this Court cannot then rule that the plaintiff is not entitled to liquidated damages. See, e.g., Alvarez Perez, 515 F.3d at 1162-63. If a jury finds no willfulness, the Court still has a full range of options available to it in ruling on liquidated damages. See, e.g., Rodriguez v. Farm Stores Grocery, Inc., 518 F.3d 1259, 1273–74 (11th Cir. 2008) (holding that it was not inconsistent for jury to find that employee had not proven willfulness and judge to find that employer had not proven good faith). Because this Court has found that the question of willfulness is one for the jury to decide, the Court must "await the finding of the jury about willfulness" before it can make "a determination as to [plaintiff's] entitlement to liquidated damages." Davila v. Menendez, 717 F.3d 1179, 1186 (11th Cir. 2013). Thus, Defendants' Motion for Summary Judgment must also be denied on the issue of liquidated damages.

---

[3]   Defendants also argue that their actions were not willful violations of the FLSA because they "acted in accord with the industry norms and practices." Doc. No. [136-1], p. 23. However, as this Court noted above, courts have, with rare exception, found that this "industry norm" is in clear violation of the FLSA. Again, a reasonable jury could find that Defendants were subjectively aware of several of these cases. Thus, reliance on such an "industry norm" cannot establish that Defendants actions were not willful, as a matter of law.

**C.** **Which Defendants are Joint Employers**

Because this Court has determined that Plaintiffs are employees, Defendants admit that Defendants Marvin Brown and Michael Barney, Sr., are joint employers. See Doc. No. [147-1], pp. 90–91, ¶291. However, they argue that Defendant MEC, and Defendant MEP are not joint employers. Doc. No. [136-1], pp. 23–25. In determining whether a defendant is a joint employer under the FLSA, this Court considers eight factors:

1.   the nature and degree of the defendant's control of the workers;

2.   the defendant's degree of supervision, direct or indirect, of the workers;

3.   the defendant's power to determine the pay rates or the methods of payment of the workers;

4.   the defendant's right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers;

5.   whether the defendant prepared payroll or paid the workers' wages;

6.   the defendant's ownership of the facilities where the work occurred;

7.   whether the workers performed a specialty job integral to the defendant's business; and

8.   the defendant's investment in equipment and facilities relative to that of the workers.

43

See Layton v. DHL Exp. (USA), Inc., 686 F.3d 1172, 1175--81 (11th Cir. 2012).

No one factor is determinative of whether a defendant is a joint employer. Id. at 1177. Instead, "the existence of a joint employment relationship depends on the economic reality of all the circumstances," and the factors are to be weighed "to assess the evidence of economic dependence." Id. at 1177–78 (quoting Antenor v. D & S Farms, 88 F.3d 925, 932 (11th Cir. 1996)). The focus of the inquiry "must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer." Id. at 1177.

There is no genuine issue of material fact as to whether MEP is a joint employer—it quite clearly is not. MEP owns the building, which Magic City rents, and preforms basic maintenance of the facility. Doc. No. [149-2], pp.41–42, ¶¶61–62; see also Doc. No. [136-1], p. 25. Thus, two of the eight factors listed in Layton weigh in favor of MEP being considered a joint employer, but Plaintiffs make no argument as to any other factor with regard to MEP. See Layton, 686 F.3d at 1175–81; Doc. No. [149], pp.28–29. Rather, Plaintiffs' arguments center around the facts that MEP shares personnel with Magic City, and that MEP's only business is its exclusive leasing arrangement with Magic City. See Doc. No. [149], pp.28–29.

It is true that Defendant Barney admits to being a joint employer in his individual capacity, and that he was the sole owner and employee of MEP. See Doc. No. [147-1], pp. 10–11, ¶¶27–29 However, Plaintiffs' argument that Defendant

44

Barney's actions "should impute employer status" on MPE has no basis in law. See Doc. No. [149], p. 30. Simply because Barney is joint employer does not mean that a legally distinct company he owns is also an employer. In determining whether a defendant is a joint employer, this Court looks to the "employment relationship as it exists between the worker and [that] party," not the employment relationship between the worker and some other individual. See Layton, 686 F.3d at 1177.

The only way in which Plaintiffs' work was affected by MEP was due to the fact that MEP owned and maintained the property where Plaintiffs worked. While these factors weigh in favor of MEP being considered a joint employer, none of the other factors do. MEP did not control, supervise, or pay Plaintiffs. MEP did not hire or fire any Plaintiff, and Plaintiffs' work was not integral to MEP's business. MEP owns and rents real property—that is all. Plaintiffs are not economically dependent on MEP. If this Court were to hold MEP to be a joint employer, then any and every landlord would be considered a joint employer merely because they rent a building to a company. Such a situation is obviously not what the FLSA contemplates.

Plaintiffs' argument that Defendant Barney's actions "should impute employer status" on MEC, on the other hand, is persuasive. See Doc. No. [149], p. 30. While the services that Barney provided to Magic City in his capacity as owner of MEP were merely those of a landlord, the services Barney provided Magic City in his capacity as a "consultant" for MEC make MEC a joint employer. There is no dispute that

45

Barney is a joint employer because, for example, he "provide[d] ideas to Magic City to get more customers in the club," made "decisions about whether entertainers could perform at Magic City," and made "decisions on whether or not entertainers should be suspended." See Doc. No. [132-16], pp. 12–13; see also Doc. No. [151-1], pp. 15–18, ¶¶52–53, 57, 62–63. Barney admitted that he performed these duties in his capacity as the owner of MEC. See Doc. No. [132-16], pp. 12–13. Barney explicitly stated that everything he did at Magic City was "usually through [MEC]" because it paid his salary. See id. p. 15; see also id. p. 12. If Defendant Barney is a joint employer because of his actions—and he indisputably is—then Defendant MEC is a joint employer because Defendant Barney took those actions in his capacity as a "consultant" for MEC.[4]

## IV.   CONCLUSION

The various Motions to Seal filed by both Plaintiffs and Defendants, seeking to seal certain documents in connection with these Motions for Summary Judgment, are hereby **GRANTED**. Doc. No. [130]; Doc. No. [137]; Doc. No. [146]; Doc. No. [148]; Doc. No. [167]; Doc. No. [170]. For the reasons given above, Plaintiffs' Motion for Summary Judgment is **GRANTED**. Doc. No. [131]. Defendants' Motion for Summary

---

[4] The Court notes that, in another lawsuit brought by MEC, it specifically averred that it "operated" Magic City. See Doc. No. [147-1], pp. 13–14, ¶¶43–44. MEC may, therefore, be judicially estopped from arguing that it does not "operate" Magic City. See generally Slater v. U.S. Steel Corp., ___ F.3d ___, Case No. 12-15548, 2016 WL 723012 (11th Cir. Feb. 24, 2016).

Judgment (Doc. No. [136]) is also in part **GRANTED** and **DENIED** in part. To the extent Defendants' Motion requests summary judgment on the issue of whether Defendant MEP is a joint employer, the Motion is granted and Defendant MEP is hereby **DISMISSED** from this case. See Doc. No. [136-1], pp. 23–25. In all other respects, however, Defendants' Motion for Summary Judgment is denied.

**IT IS SO ORDERED,** this 15th day of March, 2016 .

s/Steve C. Jones
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

47